# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 12-cv-3312 (JFB)(ARL)

———————————————

DONNA ZENKER,

Plaintiff,

VERSUS

RELIANCE STANDARD LIFE INSURANCE COMPANY,

Defendant.

———————————————

**MEMORANDUM AND ORDER**
September 20, 2013

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Donna Zenker ("plaintiff" or "Zenker") brings this action seeking employment benefits to which she claims she is entitled under her employer's employee welfare benefit plan, governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and administered by defendant Reliance Standard Life Insurance Company ("defendant" or "Reliance Standard"). Defendant moves for summary judgment on the grounds that sufficient evidence in the record supports defendant's decision to deny plaintiff benefits in addition to those benefits already provided. Plaintiff cross-moves for summary judgment, asserting that the evidence in the record establishes that plaintiff had an ongoing disability. In support of her argument, plaintiff points, *inter alia*, to the fact that the Social Security

Administration ("SSA") awarded plaintiff benefits. Thus, plaintiff challenges defendant's denial-of-benefits decision as arbitrary and capricious.

After careful consideration of the parties' arguments, and for the reasons set forth herein, the Court grants defendant's motion for summary judgment in its entirety and denies plaintiff's cross-motion for summary judgment.

## I. FACTS

The Court derives the facts below from the parties' affidavits, exhibits, the Administrative Record, and from the parties' respective Rule 56.1 Statement of Facts. A court considering a motion for summary judgment shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise

noted, where a party's 56.1 Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

### A. Plaintiff and the Plan

Plaintiff previously worked for JetDirect Aviation, LLC as a flight attendant. (Def.'s 56.1 Statement of Facts ("Def.'s 56.1") ¶¶ 1, 8.) A benefit of her employment was participation in JetDirect's employee welfare benefit plan ("Plan"). (*Id.* ¶ 2.) The Plan offers group long term disability coverage and is insured by defendant. (*Id.* ¶ 3.) Pursuant to the express language of the Plan, defendant has discretion to both interpret the Plan's provisions and to make benefit eligibility determinations. (*See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mot. for Summ. J.") Ex. B, at 15 (stating that "Reliance Standard Life Insurance Company shall serve as the claims review fiduciary," and that it "has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits").)

Of relevance to this dispute is the Plan's allowance for the payment of benefits in the event of "Total Disability." (Def.'s 56.1 ¶ 6.) The Plan defines this term as when, due to "Injury or Sickness, . . . an Insured cannot perform the material duties of his/her regular occupation." (*Id.*; *see also* Def.'s Mot. for Summ. J. Ex. B, at 11.) This definition changes after benefits have been paid for twenty-four months. At this point in time, an insured will be deemed "Totally Disabled" "if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis." (Def.'s

56.1 ¶ 7; *see also* Def.'s Mot. for Summ. J. Ex. B, at 11.)[1]

Plaintiff's employment position, a flight attendant, constituted a medium exertion level position under the Plan. (Def.'s 56.1 ¶ 8; *see also* Def.'s Mot. for Summ. J. Ex F, at 540-41.) On June 13, 2008, plaintiff submitted two separate claim forms in support of her request for disability benefits. (*See* Def.'s 56.1 ¶¶ 8-9; Def.'s Mot. for Summ. J. Ex. F, at 504, 506-09, 515-518.) In the first, plaintiff claims a "hypothyroid" condition and cites an inability to work because of "weakness/muscle control/headaches/tired/no concentration" (*see* Def.'s 56.1 ¶ 9; *see also* Def.'s Mot. for Summ. J. Ex. F, at 506); in the second form, plaintiff cites a "glaucoma" condition (*see* Def.'s Mot. for Summ. J. Ex. F, at 515-18).[2] Plaintiff sought long term disability benefits on account of these two conditions.

Plaintiff's hypothyroid claim included a physician's statement submitted by Suffolk First Medical, P.C. and dated June 13, 2008. (*See* Def.'s Resp. & Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Def.'s Resp. & Opp'n") at 4; *see also* Def.'s Mot. for Summ. J. Ex. F, at 510-11.) In this report, the treating physician primarily diagnosed plaintiff with hashimoto's thyroiditis, noted "subjective" symptoms of "bone aches, muscle cramps, and cognitive function," and stated an objective finding of "muscle weakness." (*See* Def.'s Mot. for Summ. J. Ex. F, at 510.)

---

[1] The Court uses the term, "Total Disability," to refer to these Plan definitions.

[2] In her opposition motion, plaintiff states that she applied for disability benefits under the Plan "on or about July 2, 2008." (Pl.'s Opp'n & Cross-Mot. at 2.) However, plaintiff cites to no documentary evidence supporting this. A review of the record shows that plaintiff submitted a request for benefits on June 13, 2008. (*See* Def.'s Mot. for Summ. J. Ex. F, at 504, 506-09, 515-18.) Thus, the Court relies on this date for purposes of assessing when the claim was first submitted.

This report noted that plaintiff's activity ability was limited to sitting or driving 1-3 hours, with no standing, walking, or lifting. (*Id.* at 511.) This same report also concluded that plaintiff was able to perform "Occasional (33%)" bending, squatting, climbing, reaching above the shoulder, kneeling, crawling, and "[u]s[ing] feet (foot controls)," and that plaintiff could drive "[f]requent[ly] (34-66%)." (*Id.*) Handwritten onto the report is the language, "no lifting." (*Id.*) Additionally, the report stated that plaintiff could use her upper extremities and both her right and left hands for repetitive "simple grasping" and "fine manipulation," but that she could not push or pull with her hands. (*Id.*) The authoring doctor, the name of whom is illegible in the report, estimated that plaintiff would be able to return to work on August 30, 2008, and that she would achieve maximum medical improvement within 3-4 months. (*Id.*)

Plaintiff's glaucoma claim did not include a corresponding physician's statement. Nevertheless, defendant obtained and examined the relevant treatment records concerning plaintiff's asserted glaucoma condition. (*See* Def.'s Resp. & Opp'n at 4.)

From the record, it appears that various subsequent physician evaluations followed concerning plaintiff's claims. The Court highlights the pertinent portions in order to assess defendant's benefit determinations.

In July 7, 2008, Dr. Michelle Guevarra Pena ("Dr. Pena"), an ophthalmologist, determined that plaintiff's activity abilities were limited to 3-5 hours of standing, sitting, walking or driving, and that plaintiff generally was able to perform activities (including bending, squatting, climbing, reaching above the shoulder, kneeling, crawling, using feet, and driving) at a "Continuous 67-100%" capacity level (instead of the "Occasional (33%)" level).

(*See* Def.'s Mot. for Summ. J. Ex. F, at 530-31.) Dr. Pena concluded that plaintiff was capable of performing "medium work," defined in the report as the ability to lift a maximum of fifty pounds, and to frequently lift and/or carry up to twenty-five pounds. (*Id.* at 531.) Dr. Pena estimated that plaintiff would be able to return to work as of September 1, 2008. (*Id.*) Dr. Pena noted no other restrictions as to plaintiff's physical abilities.[3]

Months later, Dr. Pena issued another evaluation report. This one, dated October 6, 2008, diagnosed plaintiff with glaucoma and dry eye, and also, noted the additional medical condition of carpal tunnel syndrome. (*See* Def.'s 56.1 ¶ 12; *see also* Def.'s Mot. for Summ. J. Ex. G at 631.) To the questions of "how long was or will patient be continuously totally disabled (unable to work)" or "partially disabled," Dr. Pena wrote, "not applicable." (*See* Def.'s Mot. for Summ. J. Ex. G at 632.) Thus, it appears that as of October 6, 2008, Dr. Pena did not believe that plaintiff's symptoms disabled her from performing medium exertion level work. (*See* Def.'s 56.1 ¶ 12; *see also* Def.'s Mot. for Summ. J. Ex. G at 631-62.)

Another medical report was issued the next day, October 7, 2008, by Dr. Ashok Dubey ("Dr. Dubey"), a specialist in orthopedics. (*See* Def.'s Mot. for Summ. J. Ex. G at 656-58.) Dr. Dubey diagnosed plaintiff as having carpal tunnel syndrome and stated that plaintiff "may do desk duty if available but unable to function as flight attendant." (*Id.*) Further, Dr. Dubey checked

---

[3] In addition to these physical ability observations, Dr. Pena diagnosed plaintiff with glaucoma and dry eye, noted subjective symptoms of "headache, dryness, tiredness, lids droopy, trouble focusing," listed "thyroid eye disease" as a secondary condition afflicting plaintiff, and stated no objective findings. (Def.'s Mot. for Summ. J. Ex. F, at 530.)

"yes" for the question of whether plaintiff would "be capable of performing full time work if [she] were seated most of the time (with the ability to stand or walk for brief periods of time and/or change position occasionally) and not required to lift more than 10 pounds occasionally, and/or a negligible amount of force frequently." (*Id.* at 658.) Thus, although Dr. Pena's October 6, 2008 report did not observe plaintiff to be either "continuously totally disabled" or "partially disabled," Dr. Dubey's report suggests that at least one physician did not view plaintiff's progress as sufficient for purposes of performing the medium level exertion work of a flight attendant. That being said, Dr. Dubey's report does not indicate a Total Disability, as the report states that plaintiff could perform at least sedentary work on a full-time basis. (*See id.*)

On September 10, 2008, defendant approved plaintiff's claim for long term disability benefits. (*See* Def.'s Mot. for Summ. J. Ex. E at 409-10.) The letter noted that "it is questionable whether or not your particular illness or injury will prevent you from performing substantial work activity for a period of 12 months," and noted that in order "to determine if [plaintiff] continue[s] to be disabled from [her] occupation beyond October 1, 2008, [defendant] require[s] additional medical documentation from [her] treating physician(s)." (*Id.* at 410.) Following this determination, an event occurred: on November 8, 2008, plaintiff was involved in a motor vehicle accident. (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶ 9.) Plaintiff's injuries included cervical and upper extremity pain. (*See* Def.'s Mot. for Summ. J. Ex. C, at 261.) Defendant reviewed additional medical records (consisting of physical therapist notes, with additional medical information requested) concerning plaintiff's condition on or around December 10, 2008 and December 17, 2008. (*See id.*)[4]

## B.  The Initial Denial of Benefits Determination

Following plaintiff's accident, defendant performed a residual employability analysis on December 23, 2008, taking into account plaintiff's education, training, and work experience, as well as her "current diagnosis," which included "hashimoto's thyroiditis, bilateral carpal tunnel syndrome, and cervical pain." (Def.'s Mot. for Summ. J. at 2; *see also id.* Ex. G at 675.) Defendant concluded that plaintiff's skills were "transferable" to other occupations, such as automobile club safety program coordinator, information clerk, receptionist, or tourist-information assistant. (Def.'s Mot. for Summ. J. Ex. G at 676.) The degree of exertion noted for such positions was labeled as "sedentary." (*Id.*) Based on this analysis, on February 24, 2009, defendant informed plaintiff that benefits would not be payable to her after December 30, 2009, which marked the time when the Plan's definition of Totally Disabled would change for plaintiff. (Def.'s Mot. for Summ. J. at 2; *see also id.* Ex. E at 429-31.)  In particular, defendant explained to plaintiff that "[d]uring the first 24 months that [] benefits are payable, you need only be disabled from performing the material duties of your *regular occupation*. After this period,

---

[4] Defendant contends that the nature of plaintiff's disability claims did not change following the motor vehicle accident, indicated by the fact that plaintiff never withdrew her pre-motor vehicle accident claims or, for that matter, the corresponding physician statements and medical records. (*See* Def.'s Mot. for Summ. J. Ex G, at 692-96; *id.* Ex. H, at 714-19).) Although defendant acknowledges that plaintiff made complaints following the accident, it does not appear that plaintiff filed a separate long term disability benefit claim subsequent to this occurrence, nor do the parties direct the Court's attention to any such disability claim in the record.

however, the policy requires that you be unable to perform the material duties of *any occupation*." (Def.'s Mot. for Summ. J. Ex. E, at 429.) Defendant explained that it had reviewed the medical information in plaintiff's claim file, and based on this, had determined that plaintiff was capable of performing sedentary work. (*Id.* at 429-30.)[5] Because plaintiff was deemed capable of performing the material duties of other occupations – all of which fell into the category of sedentary work – plaintiff no longer satisfied the definition of Total Disability; accordingly, she could not receive those benefits past the December 30, 2009 date. (*Id.* at 430.)

### C. The Appeal and Reconsideration

Plaintiff disagreed with this conclusion. She appealed defendant's decision, claiming that she continued to experience problems related to, *inter alia*: carpal tunnel syndrome (for which she received a prescription for physical therapy); neck and disc problems (for which she had been seeing a physical therapist); eye discomfort; and headaches and pain (which she was managing via acupuncture). (*Id.* Ex. G at 692-96.) Plaintiff also stated that she had difficulty concentrating or sitting in one position and that she required "constant breaks." (*Id.* at 694.)

In response, defendant decided to reopen plaintiff's claim. (*Id.* Ex. C at 276-77.) The effect of this reopening was to again treat plaintiff as disabled under the Plan and allow her to continue receiving disability benefits during the period of the

investigation. (*Id.*) This was so, even though the investigation went beyond the December 30, 2009 end date. (*See* Def.'s Mot. for Summ. J. at 2.) Thus, plaintiff continued to receive benefits, even though it was unclear whether plaintiff technically was Totally Disabled under defendant's post-24 month definition of that term, while defendant investigated plaintiff's claims further. (*Id.*; *see also id.* Ex. E at 450-53.)

### D. The Investigation

To perform such investigation, on both March 18, 2010 and April 2, 2010, defendant requested that plaintiff submit a Supplemental Report for Continued Long Term Disability benefits, as well as a copy of plaintiff's medical records "from all treating physicians for the period of February 17, 2009 to present." (Def.'s Mot. for Summ. J. Ex. E at 451.) Defendant received only a partial response from plaintiff, along with a promise to follow-up with additional information from her treating physicians. (*Id.*) However, the additional information was not provided. In fact, defendant re-requested such information from plaintiff, but to no avail. (*Id.*)

Defendant produced two documents, in connection with the investigation, that plaintiff asserts are probative of defendant's benefits decision. The first is a notation by Reliance Standard's Medical Department, dated April 14, 2010, noted in its medical records. The notation reads, *inter alia*, that "[m]edical review [is] completed and supports ongoing impairment to 12/31/2012." (Def.'s Mot. for Summ. J. Ex. D, at 394.) The notation also stated: "[m]edical records support no lifting greater than 10 lbs, occasional fingering and no restrictions on sit/stand/walk." (*Id.*) Plaintiff contends that this note shows that, as of April 14, 2010, defendant viewed plaintiff as

---

[5] The letter defined "sedentary work" as "exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects. . . . Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." (Def.'s Mot. for Summ. J. Ex. E, at 430.)

disabled under the Plan's terms. Defendant counters that the notation regarding "12/31/2012" was clearly a scrivener's error because plaintiff's claim was being evaluated under the occupation standard until December 2009, and there was no need to decide whether plaintiff was disabled through 2012. Moreover, defendant points out that the rest of the note, referenced above, makes clear that the examiner did not consider plaintiff to be totally disabled from sedentary level work as of April 2010.

The second is a letter, dated August 2, 2010, in which defendant stated: "[o]ur records show that you have been disabled since October 1, 2007. According to recently submitted medical documentation, you remain totally disabled. A review of this documentation by our medical department determined that you may remain Totally Disabled for at least twelve (12) months." (Compl. Ex. D.) The letter also recalculates the amount of long term disability benefits for which plaintiff might be eligible in the event she received a Social Security Disability award. (*Id.*) Plaintiff argues that this letter further establishes that, as of August 10, 2010, defendant viewed plaintiff as disabled under the terms of the Plan. Defendant counters that it is clear from the context of that letter that it was not addressing the substance of plaintiff's underlying claim, but rather, was simply memorializing the fact that plaintiff was still receiving disability benefits while the claim was being re-opened.

As of December 7, 2010, defendant still had not received the requested information from plaintiff. (Def.'s Mot. for Summ. J. Ex. E, at 450-53.) Based on the information before it, defendant determined that the record did not support a finding of disability from sedentary work level; thus, defendant would terminate plaintiff's benefits as of December 30, 2010. (*Id.*) Defendant did not

request reimbursement for those monthly benefits that it had paid from December 30, 2009 to December 30, 2010, during the period of its investigation. (*See* Def.'s 56.1 ¶ 28.)

Plaintiff responded to that determination. Specifically, she appealed, setting forth similar complaints as those stated in her prior appeal. (*See* Def.'s Mot. for Summ. J. Ex. H, at 714-19.) Plaintiff also promised to submit records from her medical providers. (*Id.*) In response, defendant sent plaintiff a letter, dated January 21, 2011, stating that it "ha[d] conducted an initial review of the information in the claim file with a Medical Staff Specialist, and determined that, in fairness to you, we will require additional medical records from your treatment providers, prior to the conclusion of our review." (Def.'s Mot. for Summ. J. Ex. E, at 456.) Defendant also requested plaintiff's medical records from "all providers with whom [plaintiff had] received medical treatment, consultation, care and/or services from December 3, 2008 until present." (*Id.*)

During this time period, plaintiff visited several physicians, specifically, Dr. Walter A. Rho ("Dr. Rho") (on December 20, 2010, February 22, 2010, and May 2, 2011)), Dr. Alfred F. Faust ("Dr. Faust") (on March 18, 2010 and August 19, 2010), Dr. Mebrahtu (on August 20, 2010), and Dr. Keefer (on March 9, 2011 and May 18, 2011). (*See* Pl.'s Opp'n & Cross-Mot. at 14.) The Court reviews the substance of each doctor's evaluations.

### 1. Dr. Rho's Evaluation

Dr. Rho examined plaintiff on February 22, 2010, on December 20, 2010, and on May 2, 2011. There is little variation amongst the three reports. In each report, Dr. Rho observed plaintiff's present condition as concerning plaintiff's right and left wrists,

with pain generally described as "dull/aching" or "throbbing, tight and tingling." (Def.'s Mot. for Summ. J, Ex. I, at 845, 851; Def.'s Mot. for Summ. J. Ex. J, at 937.) In his physical examination, Dr. Rho noted (in all three reports) that plaintiff has "carpal tunnel syndrome; there is positive tineis; positive phalens at the bilateral carpal tunnel." (Def.'s Mot. for Summ. J. Ex. I, at 846, 851; Def.'s Mot. for Summ. J. Ex. J, at 938.) As his overall assessment, Dr. Rho diagnosed plaintiff as having carpal tunnel syndrome and cervical radiculopathy, and recommended two months of physical therapy for the upper extremities in each report. (Def.'s Mot. for Summ. J. Ex. I, at 846, 851; Def.'s Mot. for Summ. J. Ex. J, at 938.) There is no other commentary regarding plaintiff's movement abilities or any notation regarding a disability in Dr. Rho's February or December 2010 reports; in Dr. Rho's May 2011 report, he noted plaintiff's current work status as "disabled," and recommends a follow-up examination. (Def.'s Mot. for Summ. J. Ex. J, at 937-38.)

## 2. Dr. Faust's Examination

Dr. Faust, who first examined plaintiff on March 18, 2010, observed plaintiff as having a neck problem, with "dull/aching, radiating and throbbing" pain. (Def.'s Mot. for Summ. J. Ex. I, at 847.) In his physical examination of plaintiff, he found plaintiff's range of neck motion to be "abnormal with crepitation, contracture and pain. Cervical examination reveal[s] pain, muscle spasm, diminished flexibility, diminished extension, diminished rotation and diminished lateral bending." (*Id.* at 848.) He also noted that plaintiff's "Spurling Exam is positive." (*Id.*)[6] There is little substantive difference between Dr. Faust's March 18, 2010 report and his August 19, 2010 evaluation. In his subsequent examination, Dr. Faust again described plaintiff's "problem [a]s located at the neck," and her pain, "as dull-aching, radiating and tight." (*Id.* 849.) This report, however, noted plaintiff's current work status as "not working due to this injury and [d]isabled." (*Id.*) Dr. Faust's overall observations remained the same, including that plaintiff's range of motion in the neck is "abnormal with crepitation, contracture and pain. Cervical examination reveal[s] pain, muscle spasm, diminished flexibility, diminished extension, diminished rotation and diminished lateral bending." (*Id.* at 850.) In contrast, however, this report states that a "Spurling Exam is negative." (*Id.*) In both reports, the doctor diagnosed plaintiff as having "cervical radiculopathy." (*Id.* at 849, 850.)

## 3. Dr. Mebrahtu's Examination

Dr. Mebrahtu examined plaintiff on August 20, 2010. (*Id.* at 871-72.) In his report, the doctor noted plaintiff's past medical history (including, *inter alia*, thyroid disease, glaucoma, and carpal tunnel syndrome), listed the medications that plaintiff was taking, and summarized plaintiff's history of illness (acknowledging plaintiff's complaints of neck and shoulder pains). (*Id.* at 871.) Regarding plaintiff's overall examination, Dr. Mebrahtu stated that plaintiff's neck "is supple," that "[s]he has tenderness in the paracervical region, worse on the right than the left with decreased range of motion on lateral side bending," and that "[t]here is no palpation tenderness in the paracervical region." (*Id.* at 872.) However, the doctor found plaintiff's

---

[6] A Spurling exam "is an evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side. Axial compression is then applied by the examiner through the top of the patient's head. The test is considered positive if the maneuver elicits . . . pain." *Alvarez v. Colvin*, No. 12-cv-3569-BK, 2013 WL 1858197, at *2 n.2 (N.D. Tex. May 3, 2013).

neurological examination to be normal, with no language or memory deficit, no visual field deficit, and no sensory deficit. (*Id.*) Additionally, the doctor found plaintiff's cranial nerves I through XII to be intact, her motor skills to be "5/5 with normal tone bilaterally," her reflexes to be "2/2 with down-going plantars," and her gait to be "normal." (*Id.*) The doctor's "diagnostic considerations" included cervical sprain, cervical herniated disc, and cervical myofascial pain syndrome. (*Id.*) Dr. Mebrahtu recommended an MRI scan of plaintiff's cervical spine to assess the potential herniated disc diagnosis, and also, additional acupuncture treatment for plaintiff. (*Id.*) The report makes no mention regarding any specific limitations on plaintiff's activity or work abilities, nor does the report address the nature and extent of any alleged disabilities.

#### 4. Dr. Keefer's Examination

Dr. Keefer examined plaintiff on two occasions: March 9, 2011 and May 18, 2011. The March 2011 report noted that plaintiff's stated problem "is located at the neck," and that she was receiving treatment from a Dr. Mebrahtu for her condition. (*See* Def.'s Mot. for Summ. J. Ex. I, at 864.) The report noted that the pain plaintiff claimed to be experiencing was "worse while sitting, standing, twisting, bending, squatting, cold, lifting, exercise and coughing." (*Id.*) Dr. Keefer made the following observations based on a physical examination of plaintiff: the cervical spine showed a decreased range of motion, there was "tenderness in the paraspinal musculature of the cervical spine with spasm," "[n]o tenderness over the bony prominences," the "[c]ervical muscle strength is full," and that there is "[n]o instability." (*Id.* at 865.) Dr. Keefer's overall assessment of plaintiff is that she suffers from neck pain arising from a motor vehicle accident, and also, cervical radiculopathy.

(*Id.*) Dr. Keefer noted that "plaintiff is disabled from neck" in the comment section to the report, but also recommended physical therapy. (*Id.*)

Dr. Keefer's May 2011 report is substantively similar to the March 2011 report. (*See* Def.'s Mot. for Summ. J. Ex. J at 997-98, Def.'s Mot. for Summ. J. Ex. K at 1004-05.) The report notes the location of plaintiff's asserted injury (namely, her neck and shoulders), and makes verbatim observations following a physical examination of plaintiff as those made in Dr. Keefer's March 2011 report. (Def.'s Mot. for Summ. J. Ex. J at 1004-05.) Regarding plaintiff's neurologic exam, Dr. Keefer states that plaintiff's coordination, along with "[s]ensation in arms and legs," is intact. (*Id.* at 1005.) In a handwritten note addressing plaintiff's diagnosis, Dr. Keefer states that "patient is disabled @ [sic] unable to work in any capacity." (Def.'s Mot. for Summ. J. Ex. J, at 998.) However, while recommending that plaintiff "no[t] work, has multiple problems," Dr. Keefer also recommends treatment with physical therapy and other medications, suggesting that plaintiff's condition may not be permanent or beyond betterment. (*Id.*) In the report, Dr. Keefer again assesses plaintiff as having cervical radiculopathy, as well as moderate to severe neck pain. (*Id.*)

\*     \*     \*

Defendant provided all received information regarding plaintiff's medical history to an independent medical examiner, Dr. Samuel Thampi, M.D. ("Dr. Thampi"), a doctor who is Board Certified in Physical Medicine and Rehabilitation and Pain Management. (*See* Def.'s Mot. for Summ. J.

Ex. J, at 971-82, 986; Def.'s Mot. for Summ. J. Ex. K, at 1013-17.)[7]

E.  The Independent Medical Examiner

In a letter dated May 16, 2011, Dr. Thampi summarized his conclusions following an April 28, 2011 examination of plaintiff. (*See* Def.'s Mot. for Summ. J. Ex. J, at 971-82.) Specifically, Dr. Thampi: (1) noted plaintiff's various medical conditions, including neck pain following a November 2008 car accident, carpal tunnel syndrome, tingling and numbness in both hands, thyroiditis, and glaucoma; (2) listed plaintiff's medications; (3) detailed the results of his physical examination of plaintiff; (4) set forth all of the information in the medical record that he had reviewed; and (5) stated his conclusions concerning plaintiff's condition. (*Id.*) Regarding the state of plaintiff's cervical spine, Dr. Thampi concluded that the cervical spine's "range of motion is within normal limits. Spurlings sign is negative. Facet tenderness is negative. Myofascial tenderness is noted bilaterally. Sensation examination is within normal limits. Manual muscle testing is within normal limits. Deep tendon reflexes are psysiologic. No pathologic reflexes were identified." (*Id.* at 973.) Dr. Thampi found similarly as to plaintiff's lumbar spine, noting that plaintiff "is able to flex the lumbar spine to the level of the knees. Straight leg raising test is negative. Lumbar facet tenderness is negative. Myofascial tenderness is negative." (*Id.* at 973-74.) Based on this examination and on all of the medical information before him, Dr. Thampi concluded that plaintiff could perform full-time sedentary work, including "Continuous[] 67%-100%)" sitting,

standing, walking, bending at the waist, squatting at the knees, using foot controls, and driving. (*Id.* at 982-83.) In that same evaluation, Dr. Thampi also observed plaintiff as having "Occasional 33% or Less" ability in both her right and left upper extremities for "simple grasping, reach[ing] above mid chest, reach[ing] at waist/desk level, pushing/pulling, fine manipulation, feeling/tactile sensation." (*Id.* at 984.)

On June 10, 2011, Dr. Thampi issued a subsequent evaluation; his opinion remained the same after reviewing additional records. (*See* Def.'s Mot. for Summ. J. Ex. K, at 1015 (stating that "[plaintiff's] capacity to work will be the same as I had documented [previously,] . . .which is a sedentary level with occasional use of the right hand"); *see also id.* at 1013-17.)

Having completed the independent medical examination, and on reviewing the entire administrative record, including the aforementioned physician reports, (*see* Def.'s Mot. for Summ. J. Ex E, at 493; Def.'s Mot. for Summ. J. Ex. F, at 530-31; Def.'s Mot. for Summ. J. Ex. G, at 631-32; Def.'s Mot. for Summ. J. Ex. H, at 722-23), defendant decided that its initial benefits determination (*i.e.*, the cancellation of benefits to plaintiff) should be upheld. (*See* Def.'s Mot. for Summ. J. Ex. E, at 489-98.) Defendant issued this final claim decision July 7, 2011. (*See* Def.'s 56.1 ¶ 40, 46.)

F.  Social Security Administration Issues an Award

In between Dr. Thampi's initial May 16, 2011 evaluation and his subsequent June 10, 2011 evaluation, an event transpired: the SSA awarded plaintiff social security disability ("SSD") benefits. (*See* Pl.'s 56.1 ¶ 29; *see also* Def.'s Mot. for Summ. J. Ex. K, at 1007-12.) According to plaintiff, this award was never submitted to Dr. Thampi or

---

[7] Dr. Thampi was provided with physician reports, along with numerous notes from plaintiff and unidentified physicians, laboratory test results, and physical therapy notes. (*See* Def.'s Mot. for Summ. J. Ex. K, at 974-76.)

any other physician involved in the evaluation of her claim. (*See* Pl.'s 56.1 ¶ 30.) The Administrative Record does not indicate otherwise, nor does defendant contest this point. Despite this award of SSD benefits, defendant ultimately decided to uphold its decision regarding plaintiff's benefits on July 7, 2011. (*See* Def.'s Mot. for Summ. J. Ex. E, at 489-98.) The details regarding this determination will be set forth *infra*.

## II. PROCEDURAL HISTORY

Plaintiff filed her complaint on July 3, 2012. On July 20, 2012, defendant answered the complaint. On January 7, 2013, defendant requested a pre-motion conference in anticipation of moving for summary judgment. The Court held the conference on January 15, 2013, at which time a briefing schedule was set. In accordance with the schedule, defendant submitted its motion for summary judgment on February 15, 2013. Plaintiff opposed the motion on March 15, 2013, and also filed a cross-motion for summary judgment. On April 8, 2013, defendant requested an extension of time in which to file its reply; the Court granted the request, and defendant filed its reply, as well as its opposition to plaintiff's cross-motion for summary judgment, that same day. On April 22, 2013, plaintiff filed her reply in support of her cross-motion. Although the parties submitted Rule 56.1 Statements with their initial motions, they also submitted additional statements on April 22, 2013 (for plaintiff) and May 10, 2013 (for defendant). Oral argument was held on May 30, 2013. The Court has fully considered the parties' submissions.

## III. STANDARD OF REVIEW

### A. Summary Judgment

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some

metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## B. ERISA and Administrative Review

A denial of benefits under ERISA "'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, (1989)). "If the insurer establishes that it has such discretion, the benefits decision is reviewed under the arbitrary and capricious standard." *Id.*; *see also Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) ("The Supreme Court . . . has indicated that plans investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard."). In this case, there is no dispute that defendant had discretion to make benefit determinations. Indeed, the Plan's express language states that defendant held discretion to both interpret the Plan's provisions and to make benefit eligibility determinations. (*See* Def.'s Mot. for Summ. J." Ex. B, at 15 (stating that "Reliance Standard Life Insurance Company shall serve as the claims review fiduciary," and that it "has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits").) Thus, the arbitrary and capricious standard of review applies.

For an administrator's decision to be deemed arbitrary and capricious, it must have been "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Krauss*, 517 F.3d at 623 (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). Courts have clarified "substantial evidence" as "'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Celardo*, 318 F.3d at 146 (alteration in original) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)). Thus, the extent of judicial review when applying the arbitrary and capricious standard is, most simply stated, narrow. *Id.*; *see also Miller*, 72 F.3d at 1070 ("When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district

court must review deferentially a denial of benefits . . . ."); *Lee v. Aetna Life & Cas. Ins. Co.*, No. 05 Civ. 2960(PAC), 2007 WL 1541009, at *4, (S.D.N.Y. May 24, 2007) ("Under the arbitrary and capricious standard of review, [the insurer's] decision to terminate benefits is entitled to deference . . . ."); *Butler v. N.Y. Times Co.*, No. 03 Civ. 5978(RCC), 2007 WL 703928, at *3 (S.D.N.Y. Mar. 7, 2007) ("'Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" (quoting *Bowman Transp. Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 285 (1974))); *Greenberg v. Unum Life Ins. Co. of Am.*, No. CV–03–1396(CPS), 2006 WL 842395, at *8 (E.D.N.Y. Mar. 27, 2006) ("Decisions of the plan administrator are accorded great deference: the court may not upset a reasonable interpretation by the administrator . . . . Accordingly, it is inappropriate in this setting for the trial judge to substitute his judgment for that of the plan administrator." (citations and internal quotation marks omitted)).

Generally, if a district court "concludes that [a Plan administrator's] decision was arbitrary and capricious, it must remand to [the administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial [or granting] of the claim or remand would otherwise be a 'useless formality.'" *Miller*, 72 F.3d at 1071 (quoting *Wardle v. Cent. States, Se. & Sw. Areas Pension Fund*, 627 F.2d 820, 828 (7th Cir. 1980)). A remand is "inappropriate 'where the difficulty is not that the administrative record was incomplete, but that a denial of benefits based on the record was unreasonable.'" *Zervos v. Verizon N.Y.,*

*Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) (quoting *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 51 n.4 (2d Cir. 1996)).

In sum, the Court's sole role here is to determine whether defendant's denial of benefits to plaintiff was without reason, unsupported by substantial evidence, or erroneous as a matter of law. *See Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999). The Court remains mindful that, under this deferential standard, it cannot "substitute [its] own judgment for that of the [Plan administrator's] as if [it] were considering the issue of eligibility anew." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). Further, "[w]here both the plan administrator and a spurned claimant 'offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control.'" *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92-93 (2d Cir. 2000) (alteration in original) (quoting *O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir. 1995)). Lastly, the Court acknowledges that the scope of its review "is limited to the administrative record." *Miller*, 72 F.3d at 1071.

## C.  The Role that Social Security Disability Benefits Play in the Context of Assessing ERISA Benefits

In the context of a benefits eligibility determination, a decision – whether favorable or otherwise – by the SSA should be considered by the ERISA plan administrator as the SSA "is an objective governmental body that undertakes a thorough review of applicants' eligibility for benefits, and has neither the incentive to disperse benefits liberally, nor a reputation of overindulging applicants." *Alfano v. Cigna Life Ins. Co. of N.Y.*, No. 07-CV-9661(GEL), 2009 WL 222351, at *17

(S.D.N.Y. Jan. 30, 2009). However, while such a determination is surely relevant, it is not conclusive; in other words, it "is but one piece of evidence, and is far from determinative" because "Social Security determinations are not binding on ERISA plans, and should not have unintended side effects on such plans not contemplated by the parties in initiating the plans, or by Congress in creating the Social Security disability structure." *Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003) (quoting *Pagan v. Nynex Pension Plan*, 846 F. Supp. 19, 21 (S.D.N.Y. 1994), *aff'd*, 52 F.3d 438 (2d Cir. 1995)).

Thus, where "a plan administrator makes a determination contrary to that of the SSA, a court may consider the contradiction as evidence of arbitrary or capricious behavior." *Miles v. Principal Life Ins.*, 831 F. Supp. 2d 767, 776 (S.D.N.Y. 2011); *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 402 (S.D.N.Y. 2010). However, courts must also recognize that "although a favorable determination by the SSA certainly supports a disability claim, it is not controlling where the administrator's decision to deny benefits is otherwise supported by substantial evidence." *Fortune v. Grp. Long Term Disability Plan*, 637 F. Supp. 2d 132, 144 (E.D.N.Y. 2009). In short, a reviewing court should carefully consider the SSA's determination in assessing whether a benefits decision by a plan administrator is arbitrary and capricious, but it is by no means bound by it. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) (stating that a court is not "obligated to ignore the SSA's determination, especially if the district court [finds] the determination probative, if not necessarily dispositive").

Moreover, when considering an ERISA Plan administrator's benefits determination along with an SSA's benefits decision, it is

important for a court to keep in mind that "the standard for reviewing a claim differs between the SSA and ERISA." *Miles*, 831 F. Supp. 2d at 776; *see also Carroll v. Hartford Life & Acc. Ins. Co.*, No. 11-cv-1009(VLB), 2013 WL 1296487, at *25 (D. Conn. Mar. 28, 2013) (acknowledging the "notable difference between a Social Security Disability benefit review and a review of a denial of a benefit under ERISA"). For instance, "[u]nlike in an SSA determination, an ERISA plan administrator need not accord special weight to the findings of a claimant's treating physician over those of an independent medical examiner." *Miles*, 831 F. Supp. 2d at 776 (citing *Suarato v. Bldg. Servs. 32BJ Pension Fund*, 554 F. Supp. 2d 399, 423 n.35 (S.D.N.Y. 2008)). That being said, neither an ERISA plan administrator nor the SSA need defer to a treating physician's opinion "which is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in the record and instead is based solely on conjecture and the patient's subjective complaints." *Carroll*, 2013 WL 1296487, at *25. Lastly, when assessing whether a claimant is disabled under an ERISA plan, such question "must be judged according to the terms of the insurance policy at issue and not according to the SSA's definition." *Miles*, 831 F. Supp. 2d at 776.

With this legal framework in mind, the Court proceeds to the merits of the case.

## IV. THE PARTIES' POSITIONS

Defendant moves for summary judgment, asserting that (1) there is substantial evidence in the record to support both defendant's initial December 7, 2010 denial of benefits decision, as well as defendant's subsequent July 7, 2011 decision to discontinue benefits, based on

the conclusion that plaintiff was not Totally Disabled under the Plan's terms, and (2) defendant is not bound by the SSA's determination as to SSD benefits, and therefore, its decision to deny benefits (contrasting with the SSA's award of benefits) cannot be considered arbitrary and capricious. For these reasons, defendant contends that summary judgment is warranted in its favor.[8]

---

[8] In its motion for summary judgment, defendant also construes plaintiff as having, in effect, raised a promissory estoppel claim. (*See* Def.'s Mot. for Summ. J. at 6-7 (citing Compl. ¶¶ 21, 60-64).) The Court does the same.

The elements of a promissory estoppel claim in the ERISA context are "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." *Berg v. Empire Blue Cross and Blue Shield*, 105 F. Supp. 2d 121, 129 (E.D.N.Y. 2000) (quoting *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 151 (2d Cir. 1999)) (internal quotation marks omitted). Additionally, a plaintiff seeking "to prevail on a claim of . . . promissory estoppel in the ERISA context . . . must prove the existence of 'extraordinary circumstances.'" *Id.* (quoting *Aramony*, 191 F.3d at 151); *see also Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993). Generally, the "extraordinary circumstances" requirement is not "satisfied unless the surrounding circumstances are indeed beyond the ordinary." *Aramony*, 191 F.3d at 152; *see also Devlin v. Transp. Commcn's Int'l Union*, 173 F.3d 94, 102 (2d Cir. 1999).

Here, plaintiff cannot satisfy the first element of a promissory estoppel claim. That is, she cannot show that defendant ever promised or guaranteed her disability benefits. Although plaintiff points to defendant's August 2, 2010 letter, which contained language representing plaintiff as disabled (*see* Compl. ¶¶ 21, 60-64; *see also* Compl. Ex. D (stating that plaintiff "continued to be considered disabled and would be so considered for twelve months")), this is not sufficient for purposes of showing a promise of benefits. The context and language of the August 2010 letter make clear that defendant was conducting an investigation into plaintiff's claim at that time, and that while performing the investigation, it was treating plaintiff as disabled; it was by no means *promising* plaintiff that disability benefits were guaranteed, nor was the letter confirming that defendant had completed its investigation and

Plaintiff counters that defendant's decision to deny her benefits was arbitrary and capricious because it contradicted all of the medical evidence in the record, including the conclusions of defendant's own independent examiner (Dr. Thampi), the findings of plaintiff's treating physicians, and defendant's internal records. (Pl.'s Opp'n & Cross-Mot. at 8-19.) Further, plaintiff notes that, prior to defendant's July 7, 2011 denial-of-benefits determination, the SSA awarded plaintiff disability benefits. (*See id.* at 18.) Plaintiff asserts that defendant improperly disregarded this award and offered no explanation for its refusal to consider it. (*Id.*) Moreover, plaintiff argues that defendant never tried to obtain the documentation upon which the SSA had made its disability determination. (*Id.* at 18-19.) Lastly, plaintiff asserts that defendant failed to provide information concerning the SSA award to Dr. Thampi or any of the other medical consultants who participated in the review of plaintiff's claim. (*Id.* at 19.) Although plaintiff acknowledges defendant's discretion to make eligibility and benefit determinations, plaintiff contends that defendant's "wholesale ignoring of the award . . . pertains to a pattern abuse of discretion in its decision

---

conclusively determined that plaintiff was disabled. Indeed, the letter also states that "[a] review of this documentation by our medical department determined that you *may* remain Totally Disabled for at least twelve (12) months." (*See* Compl. Ex. D (emphasis added).) Such language falls short of establishing a promise.

However, even if the August 2010 letter could be deemed a promise of benefits, the facts do not support an allegation of extraordinary circumstances. The evidence does not suggest that defendant issued its August 2010 letter to induce plaintiff to take (or refrain from) a given action. *See Devlin*, 173 F.3d at 102 (describing "extraordinary circumstances" as a "remarkable consideration," like a promise of benefits to induce an employee to act a certain way). For this reason, the Court grants summary judgment to defendant as to plaintiff's promissory estoppel claim.

making . . . ." (*Id.*) For these reasons, plaintiff contends that defendant's denial of benefits to plaintiff was arbitrary and capricious and that summary judgment in her favor is appropriate.

On consideration of the parties' arguments, as well as a careful review of the Administrative Record, the Court concludes that plaintiff has failed to create a genuine issue of material fact as to whether defendant's denial of plaintiff's claim was arbitrary and capricious. Accordingly, the Court grants defendant's motion for summary judgment in its entirety, concluding that its decision to deny benefits was sufficiently supported by the medical evidence in the record, and moreover, was not arbitrary and capricious. Because plaintiff's cross-motion for summary judgment concerns the same issues raised in defendant's summary judgment motion (and for which the Court finds in defendant's favor), the Court denies plaintiff's cross-motion for summary judgment.

V. DISCUSSION

Plaintiff argues that defendant's denial of benefits was arbitrary and capricious on two main grounds: (1) defendant did not adequately credit the opinions of plaintiffs' treating physicians, or, stated differently, defendant improperly gave greater weight to the report of its own independent medical examiner, Dr. Thampi, and (2) defendant failed to properly consider the SSA's award of disability benefits to plaintiff. The Court addresses each argument in turn.

A. Whether Substantial Evidence Supports Defendant's Denial of Benefits Determination

Defendant has pointed to evidentiary support in the record with regard to both its December 7, 2010 denial of benefits

determination, as well as its July 7, 2011 determination to uphold its prior denial of benefits.

First, defendant asserts that its December 7, 2010 decision to deny plaintiff benefits is supported by "more than sufficient documentation." (Def.'s Mot. for Summ. J. at 7.) In particular, defendant points to the following items in the record: (1) defendant's initial plan to discontinue benefits as of December 2009, when the definition of Total Disability, as applied to plaintiff, would change (reflected in the record as early as February 24, 2009, when defendant concluded that plaintiff was Totally Disabled from her medium strength level occupation as a flight attendant, but not from sedentary positions (*see* Def.'s Mot. for Summ. J. at 8 (citing *id.* Ex. E, at 429-31 (setting forth those sedentary occupations for which plaintiff might qualify))); (2) defendant's March 18, 2010 request for a Supplementary Report for Continued Long Term Disability benefits, including a copy of plaintiff's medical records from her treating physicians from February 17, 2009 to that current date (*see* Def.'s Mot. for Summ. J. Ex. E, at 451); (3) defendant's subsequent request to plaintiff (mailed on April 2, 2010) for copies of her medical records following plaintiff's March 30, 2010 response, in which she only sent pages one and two of the Supplemental report, and a note indicating that she would be forwarding the requested records onto defendant (*id.*); and (4) the fact that, by December 7, 2010, defendant still had not received any of the requested copies of plaintiff's medical information, despite its follow-up requests (*id.*). Based on the physician reports available at that time, defendant decided to uphold its initial February 2009 position that benefits should be denied. (*See id.* at 451-52; *see also* Def.'s Mot. for Summ. J. at 7-9.)

15

With respect to defendant's December 7, 2010 decision to deny plaintiff benefits, the Court notes that several of the physician reports to which defendant now directs the Court's attention in support of its decision to deny plaintiff benefits pre-date the November 8, 2008 car accident. However, plaintiff did not submit updated medical information to defendant post-accident. Thus, at the time defendant had to make its December 2010 benefits determination, the majority of the documentation it had consisted of pre-accident, previously-submitted medical reports. Defendant requested additional medical information from plaintiff both in March and April 2010. Because plaintiff failed to update her medical record history (and moreover, seems to have failed to change the nature of her disability claims post-accident), defendant had to make its determination based on the medical information before it; this information largely pre-dated the November 2008 accident.

In any event, defendant made the ultimate determination on July 7, 2011, which upheld its prior denial of benefits. That July 7, 2011 determination was based on all of the information in the record at the time (including post-accident medical information). As set forth below, there was substantial evidence to support its decision that plaintiff was not Totally Disabled under the terms of the Plan, and plaintiff has failed to raise a genuine issue of fact as to whether the decision was arbitrary and capricious.[9]

1. The Overall Medical Record

The main evidence in the record upon which defendant relied in making its denial-of-benefits determination consisted of the various reports of plaintiff's treating physicians, as well as the report of independent medical examiner, Dr. Thampi. The parties contest the extent to which defendant considered these reports, as well as the substantive value of each of them. In particular, plaintiff argues that the overall medical records in her file, as well as the physician evaluation upon which defendant largely relied (Dr. Thampi's), do not support defendant's ultimate determination. However, after a careful review of the record, the Court disagrees.

The physician whom defendant credited and relied on in part when electing to deny benefits was its independent medical examiner, Dr. Thampi. Dr. Thampi issued a comprehensive, detailed report, setting forth all of the reasons in support of his conclusion that plaintiff was not disabled.[10] His determination was based on a physical examination of plaintiff, *cf. Zoller v. INA*

---

[9] Plaintiff additionally argues that defendant, prior to its December 2010 determination, already had recognized plaintiff as disabled. Specifically, plaintiff directs the Court's attention to the fact that defendant issued two letters in 2010 – one dated April 14, 2010 and the other, August 2, 2010 – in which defendant used language to the effect that plaintiff has a disability. (*See* Pl.'s Opp'n & Cross-Mot. at 16 (quoting April 14, 2010 note and stating that

"[m]edical review completed and supports ongoing impairment to 12/31/2012"); *id.* (quoting Def.'s Mot. for Summ. J. Ex. E at 440-42 (stating that "[o]ur records show that you have been disabled since October 1, 2007[, and] [a]ccording to recently submitted medical documentation, you remain totally disabled")).) However, the Court finds that argument to be without merit. Defendant had made clear that following plaintiff's initial appeal, it was treating her as disabled (and giving her benefits accordingly) while it investigated her claim. Thus, it is clear, in the context of the entire record, that these records did not indicate a merits determination by defendant that plaintiff was Totally Disabled or entitled to additional benefits. Instead, the review was not complete until December 7, 2010, at which time defendant issued its benefit determination.

[10] Although Dr. Thampi issued both an initial and a supplementary report, the Court considers them as one here for purposes of assessing the completeness of his overall evaluation of plaintiff's condition.

*Life Ins. Co. of N.Y.*, No. 06-cv-112(RJS), 2008 WL 3927462, at *13 (S.D.N.Y. Aug. 25, 2008) (stating that "[i]t is well settled that, in denying a claim for benefits under ERISA, the plan administrator may rely on the opinion of independent medical reviewers who have *not* conducted an examination of the applicant, even where the reviewer's opinion conflicts with that of the treating physicians" (emphasis added)), as well as an extensive review of the reports of plaintiff's treating physicians (including Dr. Pena, Dr. Dubey, Dr. Mebrahtu, Dr. Keefer, Dr. Adler, and Dr. Rho's evaluations, as well as intake and physical therapist notes), which are referenced and discussed in his report.[11]

Although plaintiff argues that Dr. Thampi's conclusions actually *support* her claim of disability (*see* Pl.'s Opp'n & Cross-Mot. at 12; Pl.'s Reply at 1-2), the Court disagrees. Dr. Thampi concluded that plaintiff can work at an exertion level of "[s]edentary lift – exerting up to 10 pounds of force occasionally, and/or a negligible amount of force frequently." (Def.'s Mot. for Summ. J. Ex. J, at 983.) Dr. Thampi also stated that plaintiff can perform continuous (*i.e.*, 67% to 100%) sitting, as well as standing, bending, walking, squatting, using foot controls, and driving. (*Id.*) He also identified her as capable of frequent (*i.e.*, 43% to 66%) climbing of stairs and ladders, kneeling, and crawling. (*Id.*) Additionally, he stated that plaintiff "can work full time as of 12/30/10." (*Id.* at 980.)[12] These statements certainly do not meet the definition of Total Disability (*i.e.*, that a claimant, due to injury or sickness, can only perform a job's material duties on a part-time basis or part of a job's material duties on a full-time basis) that plaintiff must satisfy in order to receive disability benefits under the plan; in fact, they very much surpass it, with Dr. Thampi concluding that plaintiff can perform various material duties on a full-time basis.

---

[11] Though plaintiff takes issue with many of Dr. Thampi's conclusions (including his overall finding that plaintiff was not disabled), the Court finds it noteworthy that not all of Dr. Thampi's diagnoses conflicted with those of her treating physicians. For instance, although plaintiff notes Dr. Thampi's failure to diagnose her with bilateral (as opposed to unilateral) carpal tunnel syndrome, the report shows that Dr. Thampi did consider the condition, but simply concluded that plaintiff's carpal tunnel syndrome was limited to her right side. (*See* Def.'s Mot. for Summ. J. Ex. J, at 972 (stating that plaintiff "ha[d] a diagnosis of carpal tunnel syndrome in 2007 and has had tingling and numbness in both hands"; "[s]he uses her carpal tunnel splints at night"); *see also id.* at 979.) This does not conflict *per se* with plaintiff's treating physicians, as at least one (Dr. Dubey) concluded that plaintiff's carpal tunnel syndrome was not disabling for purposes of plaintiff's performing sedentary work. (*See* Def.'s Mot. for Summ. J. Ex. G, at 656-57 (diagnosing plaintiff with carpal tunnel syndrome and stating that "plaintiff may do desk duty if available but unable to function as flight attendant").) Additionally, despite not diagnosing plaintiff with cervical radiculopathy, Dr. Thampi still clearly considered plaintiff's cervical complaints. Specifically, he determined that she had myofascial pain syndrome of the neck, and recommended both injection therapy (previously recommended to plaintiff by her treating physicians but rejected by her), as well as physical therapy (also recommended to plaintiff by her treating physicians). (*See* Def.'s Mot. for Summ. J. Ex. J, at 973-74, 979-

82.) Thus, it cannot be said that Dr. Thampi's conclusions were different, in every instance, from that of her treating physicians. Most simply stated, Dr. Thampi's report is extremely thorough – indeed, of the various medical reports in the record, it is unquestionably the most substantive and detailed in nature. The Court sees nothing unreasonable in defendant's decision to credit Dr. Thampi's conclusions over those of plaintiff's treating physicians.

[12] Given that Dr. Thampi's initial report was issued on May 16, 2011, the proposed December 30, 2010 start date is somewhat confusing. However, based on context, the Court understands it to mean that as of December 2010, plaintiff was capable of returning to full-time work at that point in time.

Regarding the upper half of plaintiff's body, Dr. Thampi concluded that plaintiff should be limited to occasional (*i.e.*, 33% or less) simple grasping, reaching above mid-chest, reaching at wrist/desk level, pushing/pulling, fine manipulation, and feeling tactile sensation on both her left and right sides. (*Id.* at 984.) Although plaintiff asserts that this means she cannot perform sedentary work, the Court disagrees with her reasoning. The plan defines sedentary as "exerting up to 10 pounds of force *occasionally* and/or a negligible amount of force *frequently* to lift, carry, push, pull or otherwise move objects, including the human body." (Def.'s Mot. for Summ. J. Ex. E at 492 n.3 (emphasis added).) Dr. Thampi's findings (that plaintiff occasionally can exert her upper extremities, can frequently climb stairs and ladders, kneel, and crawl, and can continuously sit, stand, bend, walk, squat, and drive) noticeably parallel the plan's definition of sedentary work, and therefore, support defendant's conclusion that plaintiff is capable of performing the material elements of a sedentary position on a full-time basis.

Plaintiff attempts to discredit Dr. Thampi's report, questioning not only his actual findings (discussed *supra*), but also, the "independent" nature of his examination. (*See* Compl. ¶ 25; *see also* Pl.'s Reply at 8 (noting that Dr. Thampi was hired by defendant).) The Court rejects any such attempt. The law is clear that even where an independent consultant is paid by a party, that "does not disable [the plan administrator] from considering [his or her] opinions in making benefit decisions." *Suren v. Metro. Life Ins. Co.*, No. 07-cv-4439(JG)(RLM), 2008 WL 4104461, at *11 (E.D.N.Y. Aug. 29, 2008). Instead, what matters is the relevant speciality that the doctor held in order to competently review a claimant's records. *See id.*; *see also Fitzpatrick v. Bayer Corp.*,

No. 04 Civ. 5134(RJS), 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008) (evaluating whether the independent medical examiners retained by the plan to examine plaintiff's records were sufficiently qualified to assess plaintiff's disability). Here, it is clear that Dr. Thampi was qualified to consider plaintiff's alleged disability. Plaintiff complained of, *inter alia*, neck and hand/wrist pain. Dr. Thampi is Board Certified in Physical Medicine and Rehabilitation and Pain Management. Thus, Dr. Thampi was qualified to consider plaintiff's asserted conditions, and defendant was not unreasonable when, after considering all of the medical information in plaintiff's file, it decided to credit Dr. Thampi's opinion over that of plaintiff's treating physicians.

However, the fact that defendant relied on Dr. Thampi's report is not to say that defendant did not consider the opinions of plaintiff's physicians. (*See* Pl.'s Opp'n & Cross-Mot. at 14-15.) Despite plaintiff's arguments asserting otherwise, the record shows that in its July 7, 2011 determination, defendant not only considered the records of plaintiff's treating physicians, but it also referenced many of them at length in its denial-of-benefits decision. (*See* Def.'s Mot. for Summ. J. Ex E at 492-94 (referencing the reports of Drs. Pena, Han, Dubey, Rho, Faust, Keefer, and Mebrahtu, as well as the requested-but-unavailable medical reports of Drs. Meeru, Sumeer and Welsch; comprehensively discussing the various reports and findings of Drs. Dubey, Pena, Mebrahtu, Keefer, Rho, and Adler).)[13] A

---

[13] In her opposition papers, plaintiff confusingly contends, on the one hand, that defendant failed to consider the reports of plaintiff's treating physicians, and on the other hand, that defendant improperly considered plaintiff's physician reports pre-dating the November 2008 accident, as well as reports from plaintiff's ophthalmologist when assessing whether benefits were warranted. For this reason, plaintiff

review of defendant's denial-of-benefits decision shows that, in examining the various medical evaluations in plaintiff's file, defendant reasonably rejected some of plaintiff's physicians' conclusions (as not all held the same opinion) that plaintiff was disabled on considering diagnostic findings that indicated to the contrary. It also noted the various physicians' (including defendant's own medical examiner, Dr. Thampi's) similar recommendations that plaintiff's condition be treated

conservatively (*i.e.*, with physical therapy and acupuncture), as well as plaintiff's failure to follow such treatment recommendations in the past. The fact that defendant credited certain doctors' evaluations over others does not mean that defendant's decision is unsupported by the record or unreasonable; it simply signifies that defendant based its decision, which it explained in extensive detail,[14] on certain medical evidence over other information in the file.

Regarding defendant's decision to credit the overall opinion of its independent medical examiner over that of plaintiff's

---

argues that, "totally contrary to its stated position, [defendant] has absolutely no relevant evidence from [plaintiff's] treating doctors that she 'is capable of working in a sedentary position'" or that long-term benefits are not warranted. (Pl.'s Opp'n & Cross-Mot. at 13.) The Court's response is three-fold.

A review of defendant's July 7, 2011 decision clearly shows that defendant considered physician reports that post-dated the November 2008 accident, and from physicians whose qualifications extended beyond the field of ophthalmology. (*See* Def.'s Mot. for Summ. J. Ex E at 492-94 (referencing the reports of Drs. Pena, Han, Dubey, Rho, Faust, Keefer, and Mebrahtu, as well as the requested-but-unavailable medical reports of Drs. Meeru, Sumeer and Welsch; comprehensively discussing the various reports and findings of Drs. Dubey, Pena, Mebrahtu, Keefer, Adler and Rho).) Second, the fact that defendant considered records pre-dating plaintiff's accident makes sense, as at least two of plaintiff's claimed disabilities (carpal tunnel syndrome and glaucoma) predate the car accident. Third, the record shows that plaintiff received a full and fair review of her claims. Although defendant may have made its initial determination to deny benefits based on medical evidence which, for the most part, pre-dated her November 2008 accident, the record also shows that when plaintiff appealed, defendant – while temporarily reinstating her benefits during its period of investigation – requested additional medical information from plaintiff, reviewed all medical information it received, and even consulted an independent medical examiner before ultimately deciding to deny benefits. For reasons set forth *supra* and *infra*, defendant was perfectly entitled to credit certain physician evaluations over others, and to reject opinions not supported by objective evidence. Thus, the Court rejects plaintiff's contention that defendant's decision is unsupported by the medical evidence in the record.

[14] Even if defendant had not gone into detail regarding the basis of its decision – including referencing and discussing the opinions of plaintiff's treating physicians – this would not be grounds for summary judgment in plaintiff's favor. The law is clear that a plan administrator has no obligation to reference every document that it has reviewed in its benefit determination letter. Indeed, a plan administrator, like defendant, need not even set forth a detailed explanation as to why it decides to credit reliable evidence – that conflicts with a treating physician's determination – over that of a claimant's physician's opinion. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) (stating that there is no "heightened burden of explanation . . . when [a plan administrator] reject[s] a treating physician's opinion"); *see also Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) ("A plan administrator need not . . . annotate every paragraph of a thousand-page medical record."); *Demirovic v. Bldg. Serv. 32B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006); *Blajei v. Sedgwick Claims Mgmt. Servs. Inc.*, 721 F. Supp. 2d 584, 611 (E.D. Mich. 2010) (stating that ERISA "does not require a denial letter to describe every detail relating to the decision to deny benefits"). Accordingly, the fact that defendant chose to credit Dr. Thampi's evaluation over those of plaintiff's treating physicians, and the fact that defendant discussed why it decided to deny plaintiff benefits based on the reports of both Dr. Thampi and plaintiff's treating physicians, does not establish that defendant's decision was arbitrary and capricious; rather, it shows to the contrary.

treating physicians, it is well-accepted that a plan administrator may rely on the opinion of an independent medical examiner when making a benefits determination, even if a claimant offers a treating physician's (or physicians') opinions in support of his or her claim. *See Suarato*, 554 F. Supp. 2d at 420 (stating that "[a]lthough '[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinion of a treating physician[]. . . courts have no warrant to require administrators to accord special weight to the opinions of a claimant's physician'" (alterations in original) (quoting *Nord*, 538 U.S. at 834)); *see also Paljevic v. Bldg. Serv. 32B-J Health Fund*, No. 06-cv-1196(NGG)(RML), 2007 WL 1958888, at *9 (E.D.N.Y. June 29, 2007) (stating that "[t]he Fund is entitled to rely on the determinations of its own independent physicians over the findings of doctors proffered by Plaintiff"). That is, a treating physician's opinion on the ultimate question of disability is not binding on an ERISA plan. *See Nord*, 538 U.S. at 834.

As set forth *supra*, plaintiff submitted various treating physicians' opinions and corresponding reports regarding the nature and extent of her disability. (*See* Def.'s Mot. for Summ. J. Ex. E  at 489-98; *see also* Pl.'s Opp'n & Cross-Mot. at 14; Def.'s Resp. in Opp'n to Pl.'s Cross-Mot. ("Def.'s Resp.") at 11-13.) Several of these physicians proffered the opinion that plaintiff had a disability. *See supra*. Defendant, however, decided to credit the opinion of Dr. Thampi over the opinions of plaintiff's treating physicians. This is permitted. *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 85 (2d Cir. 2009) (holding that ERISA plan administrator did not abuse its discretion when it relied on the opinions of independent consultants over the conflicting opinions of claimant's treating physicians regarding the question of disability); *see*

*also Alto v. Hartford Life Ins. Co.*, 485 F. App'x 482, 484 (2d Cir. 2012) (concluding that denial of benefits was not arbitrary or capricious where independent medical examiner was credited over plaintiff's treating physician, particularly where independent examiner noted a lack of objective evidence supporting claimant's disability, as well as the treating physicians' failure to articulate why claimant could not perform sedentary work); *Tortora v. SBC Commc'ns Inc.*, 446 F. App'x 335, 339 (2d Cir. 2011) (finding administrator's decision neither arbitrary nor capricious where it was based on a file review conducted by qualified independent medical reviewers, even though those reviewers' opinions conflicted with those of claimant's treating physicians). Indeed, the law is clear that defendant was not obligated to give plaintiff's treating physicians' opinions any special deference when making its determination. *See Nord*, 538 U.S. at 834 (stating that "[n]othing in the Act . . . suggests that plan administrators must accord special deference to the opinions of treating physicians").

In addition, a review of defendant's decision shows that, in addition to crediting certain medical evidence over other medical information in plaintiff's file, defendant also noted a lack of objective proof of plaintiff's claimed disability as a relevant factor towards its denial of benefits. (*See* Def.'s Mot. for Summ. J. Ex. E  at 496.) Specifically, defendant made the following observations in its denial-of-benefits decision:

[Y]ou maintain that you remain Totally Disabled, as you allege that you cannot sit or stand for prolonged periods however, we have identified that you are capable of sedentary work function and this level of exertion allows the flexibility of

changing positions (e.g. occasional walking and standing and stretching 1-2 times per hour). You also indicate that you are precluded from driving however, your medical file does not contain any documentation which suggests that you are limited in this regard. Moreover, it does not appear that driving is a requirement for any of the alternative occupations, which were identified by the REA . . . . Furthermore, you indicate that your thyroid disease causes irritability, mood swings, chronic fatigue, forgetfulness and muscle aches and therefore precludes you from working in any capacity however; it is interesting to note that you were able to work on a part-time basis with such complaints from October 1, 2007 through April 2, 2008.

(*Id.*)

Courts have held that "it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits." *Fitzpatrick*, 2008 WL 169318, at *10; *see also Hobson*, 574 F.3d at 88 ("We conclude that it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability."); *Suren*, 2008 WL 4104461, at *11 (stating that the plan administrator "did not abuse its discretion when it based its opinion on objective tests and examinations, despite [claimant's] subjective complaints of fatigue and weakness"). The Court here likewise concludes that defendant's decision to credit certain medical evaluations over others, and also, to require objective proof of plaintiff's disability before granting long-

term benefits, was neither arbitrary nor capricious.

Finally, to the extent plaintiff seeks to assert a structural conflict of interest claim, the Court similarly rejects this challenge. Generally, when an administrator both evaluates and pays benefits claims, the court "must take [the conflict] into account and weigh [it] as a factor in determining whether there was an abuse of discretion . . . ." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008); *see also Miles v. Principal Life Ins. Co.*, 12-152-CV, 2013 WL 3197996, *11 n.13 (2d Cir. June 26, 2013) ("In reviewing an administrator's decision under the deferential 'arbitrary and capricious' standard, we remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due."). A conflict of interest is included as one of several different factors that a reviewing judge must take into account when reviewing a denial of benefits and its weight is in proportion with the "'likelihood that [the conflict] affected the benefits decision.'" *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139-40 (2d Cir. 2010) (alteration in original) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). "[N]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Id.* at 140 (citing *Hobson*, 574 F.3d at 83). "Evidence that a conflict affected a decision may be categorical (such as a history of biased claims administration) or case specific (such as an administrator's deceptive or unreasonable conduct) . . . ." *Id.* (citation and internal quotation marks omitted).

Here, there is evidence of a structural conflict of interest, as defendant served as both the administrator and payer of claims.

*See Glenn*, 554 U.S. at 112. However, plaintiff presents no evidence (or arguments, for that matter) showing that any such conflict of interest (assuming *arguendo* that it was present here) affected the reasonableness of its determination. *See Fortune*, 391 F. App'x at 79 ("Fortune has adduced no evidence indicating that Hartford has a history of biased claims administration. Nor is the record medical evidence so thin or unsound as to call into question the legitimacy of Hartford's determination of this particular claim. For the foregoing reasons, we reject Fortune's claim that Hartford's conflict of interest warrants a finding that its decision denying her claim for benefits was arbitrary and capricious."); *Pretty v. Prudential Ins. Co. of Am.*, 696 F. Supp. 2d 170, 189 (D. Conn. 2010) (finding that plaintiff "has presented no evidence to suggest that Prudential may have been, much less was, influenced by the conflict," and stating that "the Court does not believe that Prudential's conflict of interest should be accorded significant weight"). Instead, as noted *supra*, defendant gave thorough consideration of the claim, including all of the medical information that was available to it. Thus, this is a case in which the conflict "should prove less important (perhaps to the vanishing point) [because] the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117. Accordingly, the Court concludes that the structural conflict of interest is entitled to little weight in this particular case. In any event, even if it is afforded some weight, it is overwhelmingly outweighed by the other factors supporting the adverse benefits determination, discussed *supra*.

\*     \*     \*

In sum, the Court concludes that substantial evidence supported defendant's decision to deny plaintiff benefits, including

the reports of its independent medical examiner (which defendant permissibly credited over the opinions of plaintiff's treating physicians), plaintiff's overall medical file, and the lack of objective proof of disability. Plaintiff has failed to raise a genuine issue of fact as to whether defendant's decision was arbitrary and capricious, and summary judgment in defendant's favor is warranted.

### B. Social Security Administration's Award of Benefits to Plaintiff

Plaintiff challenges defendant's denial-of-benefits decision on another ground. Specifically, plaintiff argues that defendant failed to consider the fact that during the course of defendant's review of her disability claims and medical records, the SSA awarded plaintiff social security benefits. (*See* Def.'s Mot. for Summ. J. Ex. K at 1007-12.) This award of SSD benefits, coupled with defendant's failure to consider it, or even request the documentation upon which the SSA based its decision, is, according to plaintiff, grounds for summary judgment in her favor. (*See* Pl.'s Opp'n & Cross-Mot. at 18-19; Pl.'s Reply at 3-4.)

It is clear that defendant considered the SSA's award of benefits to plaintiff. In its July 7, 2011 denial-of-benefits decision, defendant explicitly states: "*we acknowledge your receipt of a favorable award for Social Security Disability (SSD) income*, which was issued by the [SSA] on June 5, 2011 indicating that you became disabled under its rules on April 30, 2008." (Def.'s Mot. for Summ. J. Ex. E at 497 (emphasis added).) Defendant then goes on to explain why its determination may have differed from that of the SSA:

[I]n your situation, the SSA may not have been privileged to review the results of the independent medical

examination, which was completed at [defendant's] request by the independent physician, Dr. Samuel P. Thampi, M.D., or other medical or vocational information [that defendant] may have developed as part of your claim adjudication. If the SSA were to review this information in addition to any other information obtained by [defendant] they may reach a similar conclusion.

(*Id.*)

Thus, plaintiff's contention that defendant ignored her award of SSA disability benefits is not accurate. Defendant acknowledged it; it simply disagreed with the SSA's overall determination. Although plaintiff contends that such disagreement warrants remand or judgment in plaintiff's favor, the Court disagrees.

First, as noted *supra*, a plan administrator is not bound by an SSA determination. *See Lekperic v. Bldg. Serv. 32B-J Health Fund*, 2004 1638170, at *6 (E.D.N.Y. July 23, 2004); *see also Suarato*, 554 F. Supp. 2d at 423 (noting that SSA determination, which plan administrator considered but ruled differently from, was not binding on the administrator); *Pagan*, 846 F. Supp. at 21 (stating that "Social Security determinations are [] not binding on ERISA plans"). Indeed, the law is clear that "[a]n SSA award is by no means determinative of a claimant's eligibility under an ERISA plan." *Ianniello v. Hartford Life & Acc. Ins. Co.*, 508 F. App'x 17, 21 (2d Cir. 2013); *see also Billinger*, 240 F. Supp. 2d at 285 (stating that while an SSA award is "one piece of evidence," it is "far from determinative"). While it is true that courts may consider a plan administrator's decision that conflicts with that of the SSA as "evidence of arbitrary or capricious behavior," *VanWright*, 740 F. Supp. 2d at

402, the latter disability award is by no means conclusive, *see id.* at 404-05 (finding that "it was not arbitrary or capricious for [the plan administrator] to reach a conclusion different from the SSA," as "while the SSA's determination can inform the Court's review, it is not dispositive"). Thus, the fact that the SSA decided to award plaintiff benefits in this case did not automatically require defendant to do the same. This makes sense, as "the question of whether or not a claimant is disabled must be judged according to the terms of the Policy and not according to the SSA's definition," which may vary. *Id.* at 402.

Second, "although a favorable determination by the SSA certainly supports a disability claim, it is not controlling where the administrator's decision to deny benefits is otherwise supported by substantial evidence." *Fortune*, 637 F. Supp. 2d at 144. Such is the case here. As discussed *supra*, defendant here properly considered the SSA's determination, but it declined to give it dispositive effect. This was largely due to the fact that substantial evidence in the record, including the extensively detailed report of defendant's independent medical examiner, as well as the results of diagnostic tests, and the lack of objective evidence, supported the conclusion that plaintiff was not Totally Disabled under the plan. However, it was also due in part to the fact that the SSA determination itself was simply a one-page letter (aside from those pages summarizing corresponding Medicare benefits and tax implications), confirming that plaintiff had been awarded SSA disability benefits, with no findings or stated reasonings explaining the SSA's determination.[15] Defendant did as it should

---

[15] Plaintiff notes that she "does not contend that [defendant] is mandated to consider the Society Security [award]," but asserts that "there is no question that [defendant] failed to engage in any substantive consideration of the merits of the award

have – it considered the SSA's award of benefits as part of plaintiff's record, and it made its decision based on the information before it, including information that was not before the SSA (like Dr. Thampi's detailed report). *See Lekperic*, 2004 WL 1638170, at *6 ("[The plan administrator] reviewed and considered the SSA determination of disability as part of the record that [claimant] submitted to support her claim. That was all [it was] required to do. The [administrator's] refusal to follow the SSA ruling was not arbitrary or capricious in light of the other evidence. . ., and also in light of the fact that definitions of 'disability' under the Funds is different and much stricter than that under the [SSA].") Defendant had no other information concerning the SSA's determination upon which to base its own

decision, aside from the award itself. Thus, although defendant did not explain in great detail why it chose not to credit the SSA award, it was not required to do so, particularly given the substantial medical evidence in the record supporting its conclusion. *See Testa v. Hartford Life Ins. Co.*, 483 F. App'x 595, 598 (2d Cir. 2012); *see also Hobson*, 574 F.3d at 92 (concluding that plan administrator's decision to deny disability benefits, even where SSA had awarded the same, was neither arbitrary nor capricious, even where administrator failed to explain its reasons for concluding that claimant was not disabled despite SSA's conclusion to the contrary).

Third, the fact that defendant did not send notice of the SSA award onto its independent medical examiner is not problematic. To begin with, neither Dr. Thampi nor defendant is bound by the SSA's determination. *See Pagan*, 846 F. Supp. at 21 (stating that "Social Security determinations are. . . not binding on ERISA plans"). Additionally, the purpose of Dr. Thampi's evaluation was to physically examine plaintiff, review her entire medical history, and from this information, determine the present state of her alleged conditions. Plaintiff's implicit argument appears to be that, had Dr. Thampi received notification of the SSA award and/or the information upon which the SSA made its determination – information which plaintiff does not identify nor distinguish from that information presented to defendant for its ERISA benefit review – his professional, medically-based opinion likely would have been different. The Court rejects this notion; an "SSA determination need not be placed before [a plan administrator's] medical examiners for their consideration [because this] would be conceptually anathema to an independent medical review untarnished by an administrative agency's determination." *Durakovic v. Bldg. Serv. 32B-J Pension*

---

or the evidence supporting it." (Pl.'s Reply at 3.) However, plaintiff has identified no documents that reveal the basis for the SSA's determination. She, in turn, argues that it was defendant's duty to have requested such information from the SSA. (*See* Pl.'s Opp'n & Cross-Mot. at 18-19 (stating that defendant "made no effort to obtain any of the documentation submitted to the [SSA] or pertaining to the SSD award").) However, defendant already had requested – on numerous occasions – updated medical information from plaintiff, noting the necessity of such information in order to evaluate plaintiff's disability claim in full. Moreover, at oral argument, the Court questioned plaintiff as to what additional documentation had been sent onto the SSA that defendant had not received or reviewed and which plaintiff contended should have been considered. Plaintiff was unable to affirmatively answer the question. (*See* Oral Arg. May 30, 2013.) In light of this, the Court cannot fault defendant for making its determination based on the complete file before it, which included all of the information concerning the SSA award of benefits that plaintiff had submitted to it. *See Ianniello*, 508 F. App'x at 21 (finding no problem with defendant's decision to deny plaintiff coverage, even though SSA had awarded plaintiff benefits, where plaintiff only provided defendant with a letter from the SSA confirming the amount of disability benefits that she would be receiving each month and provided no other documentation regarding SSA's findings).

*Fund*, 642 F. Supp 2d 146, 153 (E.D.N.Y. 2009).

Courts repeatedly have recognized that "it is not very surprising that a claimant could qualify for Social Security disability benefits, but in the plan administrator's discretion be denied private disability benefits on the same administrative record." *Suarato*, 554 F. Supp. 2d at 423 n.35; *see also Testa*, 483 F. App'x at 598 (stating that "[w]hile SSA awards may be considered when determining whether a claimant is disabled, a plan administrator is not bound by the award and is not required to accord that determination any 'special deference'" (quoting *Durakovic*, 609 F.3d at 141). For the aforementioned reasons, the Court rejects plaintiff's argument that defendant failed to properly consider the SSA's award of disability to plaintiff, or that its decision to deny long term disability benefits was arbitrary and capricious on this ground.

Further, given the substantial evidence in the record, as well as defendant's consideration of the SSA's benefits award, the Court rejects the contention – raised at oral argument – that a remand is warranted here. Plaintiff has failed to identify (either in her briefs or at oral argument) what additional medical information would now be presented to defendant that had not previously been made available. Indeed, when specifically questioned at oral argument as to what other medical evidence had been given to the SSA, but which had not also been available to defendant, plaintiff was unable to offer any explanation. In essence, plaintiff's argument is that defendant's decision to deny benefits was unreasonable because it contradicted or was not supported by the evidence before it, but she masks this argument as an incomplete-Administrative-Record position, without identifying how this was so. This is insufficient for purposes of establishing

grounds for remand. *See Zervos*, 277 F.3d at 648 (stating that a remand is "inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable" (citation and internal quotation marks omitted)). In light of these circumstances, the Court does not find that a remand is appropriate.

\*     \*     \*

In sum, defendant's decision to deny plaintiff long term disability benefits was both reasonable and supported by the evidence in the record, including plaintiff's medical file (consisting of evaluations from both her treating physicians and from defendant's independent medical examiner). Thus, the Court concludes, upon carefully reviewing the Administrative Record and the parties' arguments, that defendant's decision to deny plaintiff long-term disability benefits was neither arbitrary nor capricious.

## VI. CONCLUSION

For the reasons set forth herein, the Court grants defendant's motion for summary judgment in full, denies plaintiff's cross-motion for summary judgment in its entirety, and dismisses plaintiff's Complaint. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  September 20, 2013
Central Islip, NY

* * *

Plaintiff is represented by David Lawrence Trueman of the Law Offices of David L. Trueman, Esq., 18 East 48th Street, Tenth Floor, New York, NY 10017. Defendant is represented by Emily Anna Hayes and Joshua Bachrach of Wilson, Elwer, Moskowitz, Edelman & Dicker LLP, Three Gannett Drive, White Plains, NY 10604.